IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NORTH CAROLINA MUTUAL LIFE          )
INSURANCE COMPANY,                  )
                                    )
              Plaintiff,            )
                                    )
       v.                           )          1:03CV00911
                                    )
McKINLEY FINANCIAL SERVICES         )
INC., and JAMES McKINLEY,           )
                                    )
              Defendants.           )
_____  )

MEMORANDUM OPINION

TILLEY, Chief Judge

       This suit arises from a dispute between Plaintiff North Carolina Mutual Life

Insurance Company ("North Carolina Mutual" or "NCM") and Defendants McKinley

Financial Services ("MFS") and James McKinley ("McKinley"), regarding allegations

of wrongdoing growing out of the parties' contract for insurance business.  For the

reasons set forth below, summary judgment as a matter of law is GRANTED in

part.

I.

       North Carolina Mutual is an insurance company engaged in selling life and

health insurance in twenty-three (23) states throughout the Unites States.  NCM is

incorporated in North Carolina with its principal place of business in Durham, North

Carolina.   NCM has been in existence since 1898; however, it recently decided to

1

expand beyond its traditional product lines into emerging markets. The student and sports health insurance market was one of these new markets.[1] As a result, NCM was put in contact with McKinley Financial Services and Jim McKinley. MFS is an insurance brokerage corporation organized in Florida with its principal place of business in Fort Lauderdale, Florida. McKinley is the president of MFS and a resident of Florida. After a period of negotiations, NCM and MFS entered into a Managing General Agent Agreement ("MGA Agreement") on or about December 1, 1999. This agreement appointed MFS to be NCM's Managing General Agent ("MGA") for the Student and Sports Coverage Program ("the Program").

The MGA Agreement allowed MFS to sell insurance policies to different schools on behalf of NCM. MFS agreed to "supervise, direct and implement the production underwriting, premium collection, accounting, statistical and other work necessary or incidental to the insurance business written under [the MGA Agreement]." (MGA Agreement § 6(A).) Among other things, MFS agreed to keep certain books and records, compile and file statistical information, maintain sufficient staff of trained personnel, and fully monitor the student and sports coverage program. (MGA Agreement § 6(B), (D), (E), & (I).) Although MFS was given the authority to accept and bind NCM generally, any accounts with annual premiums greater than $250,000 were first required to be submitted for NCM's

---

[1] The student and sports health insurance program consists primarily of marketing health insurance to universities and colleges and their sports programs.

2

approval. (MGA Agreement § 6(H).)

Beginning as early as 2002, management at NCM recognized problems with the Program and began to discuss possible changes. In an attempt to fix the Program's shortcomings, NCM hired Arthell D. Davis to supervise the overall management and approval of the Program.[2] On June 27, 2002, Mr. Davis sent correspondence to McKinley discussing the venture's lack of success, specifically that the block of business had experienced significant losses – $995,303 for the 2000-01 academic year, and $1,375,266 for the 2001-02 academic year. (Am. Comp., Ex. C.) The letter noted MFS's underwriting and pricing practices to be the "key drivers" in the loss, and indicated that effective immediately, "NCM must temporarily suspend the binding of any Student Insurance cases, new or renewal" with MFS. (Id.) The June 27 letter also requested from McKinley an updated listing of all bound, quoted, pending and declined cases.

Instead of terminating the MGA Agreement at this time, however, NCM and MFS negotiated a Modification to the Agreement ("Modification"), executed by both parties on November 18, 2002. The Modification required the parties "to arrive at mutually agreeable underwriting procedures for new and renewal business" (Id. at § V), and included an agreement to revise the compensation

---

[2] James J. Parrish, the former Executive Vice President of NCM, was responsible for overseeing the program from its inception in 1999 until his retirement. Although following his retirement, Mr. Parrish's role shifted to outside consultant, he continued to be involved with the operation of the Program through most of 2002.

3

formula (Id. at § VI). The new compensation formula made the commissions paid to MFS contingent on the claims ratio of the policies sold under the Program. The stated purpose for the new compensation formula was to encourage MFS to solicit and obtain business for NCM on which NCM experienced a more favorable claims loss ratio and to increase the total compensation to the MGA. (Modification § IV.) The Modification also stated that NCM would provide a line of credit to MFS, guaranteed by McKinley, personally, in an amount not to exceed 17% of the gross written premiums collected on business sold. (Id. at § VII.) Finally the Modification imposed a term for the MGA Agreement. Specifically:

> The term of the [MGA] Agreement is hereby extended through the end of the 2004-2005 School Year, and thus shall not end until at least July 31, 2005, unless sooner terminated as provided in the [MGA] Agreement. Given this extension, the termination options provided in Sections 26B.1, 26C.1, 26D.1, 26.D.2 and 26D.3 are hereby deleted. The parties further agree that the term of the Agreement may be extended beyond July 31, 2005, and excepting any final settlement obligations of the parties, such that any additional profit for subsequent School Years is split on an equal 50/50 basis. However, if the Agreement is terminated by [NCM] prior to July 31, 2005, then MGA shall have no reimbursement obligation or debt to the Company, and any amounts owed, if any, under any line of credit or promissory note and the Guaranty Agreement of James McKinley shall be canceled and extinguished. In the event of any such termination by [NCM] prior to July 31, 2005, it shall however pay all compensation and extra compensation due MGA. (Modification § X.)

Pursuant to the Modification, MFS resumed seeking and binding business for NCM for the 2003-04 school year. However, the relationship between the parties continued to deteriorate. For example, despite several attempts, an agreement was never made between MFS and NCM regarding the "mutually acceptable

4

underwriting guidelines."  Additionally, a disagreement arose between NCM and MFS regarding the insurance coverage provided to the students of the University of South Florida ("USF").  NCM contends that MFS provided false information, in September of 2002 and January of 2003, regarding the claims incurred at USF.[3] Because the USF account had premiums over $250,000, NCM retained final approval rights over the account.  Based on the erroneous claims information received from MFS, NCM alleges that it authorized a 15% increase in premiums to obtain the USF account for the 2003-04 academic year.  Instead, MFS quoted a 7% premium increase to USF and on March 19, 2003 NCM won the USF bid for the 2003-04 school year.[4]  The claims by USF students for the 2003-04 school year greatly exceeded the projections represented by MFS and resulted in a substantial loss for NCM.

On March 17, 2003, NCM sent a letter to McKinley that instructed him to "suspend binding any business until further discussions between NCM and MFS can take place." (Def.'s Trial Br., Ex. 16.)  A meeting was scheduled for March 20, 2003.  The disputes between the parties however continued and on August 14, 2003, NCM forwarded notification to participating schools, colleges and

---

[3] Specifically, NCM claims that MFS used data for four months to estimate the annual claim to be $1,328,352 and a loss ratio of 53%.  However, NCM asserts that by October of 2002, MFS had or should have had information that showed approximately $2.9 million in claims by USF students for 2001-02.

[4] The actual percentage approved by NCM, 7% or 15%, is disputed.

universities stating that "effective August 4, 2003, MFS, Inc. ("MFS") no longer represents NCM Life Insurance Company ("NCM")." (Def.'s Trial Br., Ex. 19.) The letters also instructed each school to remit all future premiums directly to NCM.

On August 26, 2003 NCM filed a Complaint against MFS [Doc. #1], alleging, 1) negligent misrepresentation, 2) breach of contract, 3) indemnification, and 4) unfair and deceptive trade practices. NCM filed its Amended Complaint against MFS and McKinley on February 25, 2004 [Doc. #14]. Defendants filed a counterclaim against NCM and a third party complaint against a subagent of MFS, Collegiate Risk Management, Inc. and Vonda White (collectively "CRM"), on March 9, 2004 [Doc. #19]. The case between MFS and CRM was settled on September 6, 2005 and was dismissed, with prejudice, on December 16, 2005 [Doc. #102]. MFS' counterclaims against NCM include claims for 1) temporary and permanent injunctive relief, 2) breach of contract by NCM, 3) tortious interference with advantageous business relationships or contractual rights, and 4) cancellation of instrument.

This case between NCM and MFS has continued on a tortuous track. After numerous discovery disputes, the jury trial was set for October 2005. Due to the difficulty in completing discovery, neither party has moved for summary judgment. At a pre-trial hearing beginning on October 3, 2005, the parties were asked to state their claims and provide all evidence they would offer to a jury to support

6

each claim.[5]  The Court will now consider the claims and evidence presented.

## II.

## A.

Although Fed. R. Civ. P. 56 does not expressly provide that district courts may enter summary judgment *sua sponte*: "there can be little doubt that district courts inherently possess that power." U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n, 873 F.2d 731, 735 (4th Cir. 1989); see also Celotex Corp v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*."). However, before exercising such power, the district court should ensure that the party against whom judgment is entered has had ample notice that it must come forward with all of its evidence. Peoples Fed. Sav. & Loan Ass'n, 873 F.2d at 735 (noting that an evidentiary hearing is not always required but that the losing party must have a full and fair opportunity to develop and present facts and legal argument in support of its position); Victus, LTD v. Collezione Europa U.S.A. Inc., 26 F. Supp. 2d 772, 775 (M.D.N.C. 1998) (citing cases).

NCM and MFS were heard regarding the validity of their claims in a pretrial hearing lasting from October 3, 2005 until October 7, 2005.  At that time, the Court requested that the parties forecast the evidence upon which they would rely

---

[5] At the conclusion of the pre-trial hearing the trial date was continued to allow time for necessary discovery to be completed.

7

at trial to support their claims, and if a sufficient showing was not made on some or all of the claims, those claims would not be permitted to proceed to trial. On October 27, 2005, this Court sent a letter to all parties notifying them that it was inclined to exercise its power to grant summary judgment *sua sponte*. NCM was given two weeks to submit any additional materials and arguments it felt necessary to defend its claim. NCM did so in its Proffer of Evidence [Doc. # 93] and Memorandum in Opposition [Doc. # 94] filed on November 10, 2005.[6] MFS filed a response on November 21, 2005 [Doc. #99]. Because all parties have been given ample opportunity to be heard and present all of their evidence, the Court will now consider, *sua sponte*, whether summary judgment is proper as a matter of law.

### B.

Summary judgment, whether *sua sponte* or on a motion from a party, is generally appropriate only when there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c). Material facts are those facts identified by the controlling law as essential elements of the claims asserted by the parties. Thus, the materiality of a fact depends on whether the existence of that fact could cause a jury to reach a different outcome. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). A genuine issue of material fact exists where there is evidence,

---

[6] In addition to the briefs filed in response to this Court's October 27th letter, both MFS and NCM have also argued their claims and evidence supporting those claims in their respective trial briefs [Docs. # 90 & 91].

viewed in the light most favorable to the non-moving party, such that a reasonable jury could find in favor of the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87, 106 S.Ct. 1348 (1986). There is no genuine issue of material fact if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. Celotex, 477 U.S. at 322-23.

Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. Anderson, 477 U.S. at 249. The party opposing the motion may not rest upon its pleadings but must instead provide evidence or point to evidence already on the record that would be sufficient to support a jury verdict in its favor. Id. at 248. Unsupported allegations and speculations are not sufficient to defeat summary judgment. Felty v. Graves-Humphreys, Co., 818 F.2d 1126, 1128 (4th Cir. 1987), see also Celotex, 477 U.S. at 323-24 ("One of the primary purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

## III.

NCM's Complaint identifies four causes of action against MFS and McKinley: 1) breach of the MGA Agreement and Modification; 2) negligent misrepresentation;

9

3) indemnification; and 4) unfair and deceptive acts and practices.[7]  These claims will now be considered separately to determine if there is a legally sufficient evidentiary basis for a reasonable jury to find for NCM on each issue.[8]

A.

NCM's first cause of action asserts that MFS has breached the MGA Agreement and Modification.  Specifically, NCM claims that MFS failed to properly train its underwriters; failed to provide documents containing claims data and other underwriting records for USF and other colleges and universities when requested by NCM; and did not provide monthly reports on a timely basis as was required by the MGA Agreement.  Additionally, NCM claims that MFS breached the MGA Agreement when it bound NCM, without proper authorization, by submitting a bid to USF based on only a 7% increase in premium.  NCM claims that these actions by MFS were a breach of the MGA Agreement and Modification and thus NCM is entitled to recover damages from MFS for those loses.

MFS, however, argues that NCM committed an anticipatory breach of

---

[7] Pursuant to MGA Agreement § 19, NCM's claims for breach of contract and indemnification are governed by North Carolina law.  See Tanglewood Land Co. v. Byrd, 261 S.E.2d 655, 656 (N.C. 1980).  Additionally, because federal jurisdiction in this case rests on diversity of citizenship, NCM's negligent misrepresentation and unfair and deceptive trade practices claims are also governed by North Carolina law under the Erie Doctrine.  See Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817 (1938); Lynch v. Universal Life Church, 775 F.2d 576, 580 (4th Cir. 1985).

[8] Defendants' counterclaims against NCM will be address below.  See infra, Part IV.

10

contract by repudiating its obligations under the MGA Agreement before the time for performance under the contract. MFS cites to Modification § X entitled "TERM" to support its claim. Section X of the Modification extended the term of the MGA Agreement as follows: "The term of the [MGA] Agreement is hereby extended through the end of the 2004-2005 School Year, and thus shall not end until at least July 31, 2005, unless sooner terminated as provided in the Agreement." (Modification § X.) Additionally, § X continues:

> However, if the Agreement is terminated by the Company prior to July 31, 2005, **then MGA shall have no reimbursement obligation or debt to the Company, *and* any amounts owed, if any, under any line of credit or promissory note and the Guaranty Agreement of James McKinley shall be canceled and extinguished**. In the event of any such termination by Company prior to July 31, 2005, it shall however pay all compensation and extra compensation due MGA. (Modification § X (emphasis added).)

MFS argues that "[c]learly this provision envisions that NCM might choose to terminate the MGA Agreement, but that if it did so, [MFS] would have no liability whatsoever to NCM." (Def.'s Trial Br. 34.) NCM disagrees.

Under North Carolina law, it is well-established that "when the language of a contract is clear and unambiguous, the court must interpret the contract as written . . . ." Corbin v. Langdon, 208 S.E.2d 251, 254 (N.C. 1974). Specifically, words in a contract, unless they have special meanings or are terms of art, should be given their ordinary meanings. Internet E., Inc. v. Duro Comm'ns, Inc., 553 S.E.2d 84, 87 (N.C. 2001). Contract language "plain and unambiguous on its face" can be interpreted as a matter of law. Taha v. Thompson, 463 S.E.2d 553, 556 (N.C.

1995) (citations omitted).  However, interpretation of an ambiguous contract requires the resolution of issues of fact, and reference to extrinsic evidence is necessary.  State ex rel. Util. Com'n v. Thrifty Call, Inc., 571 S.E.2d 622, 626 (N.C. 2002).  A contract is ambiguous if the differing constructions asserted by the parties are both reasonably supported by the language of the contract. Id.; see also Taha, 463 S.E.2d at 556.

Here, it is undisputed that the MGA Agreement and Modification constitute a valid contract.  There is also no claim of mutual mistake, duress, or undue influence by either NCM or MFS.  Rather, the parties are both sophisticated insurance companies who, with the assistance of their respective attorneys, entered into the MGA Agreement and the subsequent Modification at arms length. At issue is the interpretation of the terms of these documents.  NCM and MFS agree that the language of § X of the Modification is unambiguous, however, they each assert a different interpretation for that language.  As is explained above, MFS contends that this language states that if NCM terminated the contract before July 31, 2005, MFS would have no liability to NCM whatsoever.  NCM, however, asserts that § X does not apply to this situation because MFS repeatedly breached the contract prior to August 2003.  Alternatively, NCM argues that if § X does apply to this situation, it refers to the line of credit and Guaranty Agreement only.

NCM's contention that § X of the Modification applies to this situation because MFS terminated the agreement first by failing to perform is not supported

12

by the language of the MGA Agreement and Modification. The MGA Agreement

contains a termination clause entitled: "Section 26 TERMINATION." Section 26

provides that the agreement may be terminated by mutual agreement, or NCM may

terminate the agreement:

> ...

> 2. Upon thirty (30) days prior written notice in the event of a breach of this Agreement by MGA, unless the breaching party has remedied such breach prior to the end of the thirty (30) day period;

> 3. Immediately upon written notice in the event of fraud, abandonment, gross or willful misconduct, insolvency or lack of legal capacity to act on the part of MGA . . . (MGA Agreement § 26B.)

This language clearly draws a distinction between *termination* of the agreement

and *breach* of the agreement. In fact, *breach* of the agreement is grounds for

*termination* by the other party. Given the clear distinction between the two terms,

NCM's argument that MFS's alleged breach of the contract constituted a

termination is unsupported. To interpret it in such a way would ignore the clear

and expressed distinction between breach and termination set forth in the contract.

See Internet E., 553 S.E.2d at 87 (explaining that the terms in a contract should be

given their ordinary meanings); Olive v. Williams, 257 S.E.2d 90, 93 (N.C. 1979)

(holding the clear and express language of the contract controls its meaning).

NCM also argues that because MFS and McKinley breached the MGA

Agreement and Modification numerous times and in various ways – i.e., failure to

train, provide claims data, get NCM approval for USF bid – they effectively

13

terminated the contract. Because there is no language in either the MGA Agreement or the Modification that states that repeated breaching amounts to a termination of the contract, this argument fails. Based on the clear and expressed language of the contract, breach and termination are two distinct actions.[9] In fact, the contract specifically sets out that if MFS breaches the contract, NCM had the power under § 26B.2 to terminate with thirty (30) days written notice. Thus, although MFS may have failed to meet their obligations under the contract, because NCM terminated the contract before the specified July 31, 2005 date, § X of the Modification applies and MFS has no reimbursement obligations or debts to NCM.

NCM next argues that if § X of the Modification does apply, it refers only to the line of credit and Guaranty Agreement and not to the additional losses and damages caused by MFS's breach of contract or tortious conduct. This interpretation is also flawed. Section § X provides that if NCM terminated the agreement prior to July 31, 2005, MFS "shall have no reimbursement obligation or debt to the Company, **and**, any amounts owed, if any, under any line of credit or promissory notes and the Guaranty Agreement of James McKinley shall be

---

[9] Additionally, NCM's argument that the addition of § X only limited NCM's right to recover if it terminated the MGA Agreement **without cause** because the provisions for termination with cause remained in the agreement is also rejected. (Pl.'s Mem. in Opp'n 8.) In fact, the remainder of the termination provisions under Sections 26B.2 and 26B.3 in the MGA Agreement show the intent of the parties to leave open the possibility that NCM could terminate the contract with or without cause. However, if such termination was elected, § X would be implicated.

14

canceled and extinguished." (Modification § X (emphasis added).)  If this provision were read to apply only to the line of credit and Guaranty Agreement as NCM suggests, all of the language before the **and** is superfluous.  "Under North Carolina law we must favor an interpretation of a contract that gives meaning to every clause over an interpretation that does not." Essential Housing Mgmt., Inc. v. Walker, 1998 WL 559349, at *7 (4th Cir. June 9, 1998) (rejecting interpretation if another reasonable reading gives effect to both clauses) (citing Maddox v. Colonial Life and Acc. Ins. Co., 280 S.E.2d 907, 908 (N.C. 1981).  Thus, the only reasonable reading that gives effect to both clauses is that if NCM terminates the contract before July 31, 2005, as it did here, MFS has no reimbursement obligation or debt to NCM **and** any amount under the line of credit or promissory note and the Guaranty Agreement is cancelled.

The application of § X of the Modification also necessarily negates NCM's claims for breach of the line of credit and Guaranty Agreement.  (Pl.'s Comp. ¶¶ 57-64, 71-76.)  First, NCM claims that under the terms of the Modification and the line of credit, signed by MFS and McKinley individually, MFS and McKinley must reimburse NCM for losses sustained by their failure to maintain a Target Claims Loss Ratio of 72%. (Pl.'s Comp. ¶ 60.)  Second, NCM claims that the Guaranty Agreement signed by McKinley personally guaranteed the line of credit supplied by NCM and therefore requires him to reimburse NCM for any losses and for the line of credit that are not made by MFS.  However, because NCM terminated the MGA

15

Agreement prior to July 31, 2005, § X of the Modification is triggered. Thus, "any amounts owed, if any, under any line of credit or promissory notes and the Guaranty Agreement of James McKinley shall be canceled and extinguished." (Modification § X.) Because there is no alternative way to read the clear directive of the contract language, NCM's claims for breach of the line of credit and breach and/or enforcement of the Guaranty Agreement are rejected as matter of law.

NCM asserts that this reading of the MGA Agreement allows McKinley to "escape all liability if he runs the business into the ground and creates a situation in which [NCM] no longer has sufficient reserves to meet the mounting claims." (Pl.'s Trial Br. 7.) However, where the contract language is clear and unambiguous, courts are not permitted to look beyond the terms to see what the parties' unexpressed intent might have been. See Paul Revere Life Ins. Co. v. Forester, 32 F. Supp. 2d 352, 355 (W.D.N.C. 1998) (citing Rosania v. Rosania, 422 S.E.2d 348, 350 (N.C. Ct. App. 1992). "Clear and express language of the contract controls its meaning and neither party may contend for an interpretation at variance with the language on the ground that the writing did not fully express his intent." Olive v. Williams, 257 S.E.2d 90, 93 (N.C. Ct. App. 1979); accord Paul Revere Life, 32 F. Supp. 2d at 355. "When competent parties contract at arms length upon a lawful subject, as to them the contract is the law of their case." General Elec. Capital Corp. v. Mktg. Research & Mgmt. Inc., 2001 WL 604195, at *2 (M.D.N.C. May 16, 2001) (internal citations omitted); see also Cara's Notions,

16

Inc. v. Hallmark Cards, Inc., 140 F.3d 566, 571 (4th Cir. 1998) ("Both parties to such a commercial contract have a duty to read the contracts carefully and are presumed to understand it.").

NCM terminated its contract with MFS prior to July 31, 2005 and therefore the limitations on recovery contained in § X of the Modification apply. Thus, NCM's claims for damages resulting from breach of contract, including both those for losses and damages and those under the line of credit and Guaranty Agreement, are dismissed as a matter of law.

B.

NCM also claims that MFS and McKinley made various negligent misrepresentations which NCM reasonably relied upon. These negligent misrepresentations were made on or about January 14, 2003 regarding the USF bid for the 2003-2004 academic year. Specifically, NCM alleges that MFS and McKinley were negligent in that they: 1) used false or misleading underwriting and claims information in preparing the USF bid for the 2003-04 academic year; 2) failed to obtain proper and financially sound information in preparing the bid for USF; 3) failed to get proper authorization before binding NCM; 4) failed to perform proper due diligence and employ reasonable business practices when preparing the bid for USF; and 5) failed to pay attention to the pattern of the school's claims history. (Am. Compl. ¶ 37.)

NCM claims that MFS and McKinley owed a duty of care to NCM, and when

17

they prepared and submitted information without reasonable care that was relied upon to the detriment of NCM they committed the tort of negligent misrepresentation. See Simmons v. Prudential Life Ins. Co., 537 S.E.2d 237, 240 (N.C. Ct. App. 2000) ("The tort of negligent misrepresentation occurs when [1] a party justifiably relies [2] to his detriment [3] on information prepared without reasonable care [4] by one who owed the relying party a duty of care."). However, ordinary breach of contract disputes can not be transformed into tort actions. See Broussard v. Meinke Discount Muffler Shops, Inc., 155 F.3d 331, 345 (4th Cir. 1998). Because parties enter into contracts in order to minimize their future risks, suing in tort for an ordinary breach of contract would "turn every potential contractual relationship into a riskier proposition." Strum v. Exxon Co., 15 F.3d 327, 330 (4th Cir.1994). "[I]t is plain that the mere failure to carry out a promise in contract . . . does not support a tort action for fraud." Broussard, 155 F.3d at 346 (internal citations omitted). However, the Restatement (Second) of Contracts recognizes, and North Carolina adopts, an exception to this rule when the breach of contract also constitutes an "independent tort." Restatement (Second) of Contracts § 355 (1981); Strum, 15 F.3d at 330; Newton v. Standard Fire Ins. Co., 229 S.E.2d 297 (N.C. 1976). North Carolina requires that the independent tort alleged be identifiable, and "distinct from the primary breach of a contract claim." Broussard, 155 F.3d at 346; see also Strum, 15 F.3d at 333 ("We think it unlikely that an independent tort could arise in the course of contractual performance, since

18

those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligation."). Additionally, even if an independent tort is made out, the tort must be accompanied by some element of aggravation, such as fraud, malice, reckless indifference, oppression, insult, and willfulness. Taha, 463 S.E.2d at 558.

Here, NCM's breach of contract claims are at the core of the parties' dispute. The MGA Agreement requires MFS to write policies "in accordance with the Company's underwriting procedure manuals and guidelines." (MGA Agreement § 6(H)), which are set out in Exhibit A to the MGA Agreement.[10] The MGA Agreement also requires MFS to submit to NCM for approval any accounts with annual premiums greater than $250,000. (Id.) Each of the actions set forth in NCM's complaint for negligent misrepresentation amount to mere breaches of the terms agreed upon by the parties in the MGA Agreement and Modification. See Broussard, 155 F.3d at 347 ("[P]laintiffs' claim for gross negligence really arises out of [Defendant's] performance on the contract, not out of the type of distinct circumstances necessary to allege an independent tort.") (citing Strum, 15 F.3d at 332-33)). Because, NCM failed to identify actions by MFS that constitute an independent tort involving the requisite aggravated circumstances, its claim for

---

[10] Although § V of the Modification anticipates changes in the underwriting guidelines, it is undisputed that "mutually agreeable underwriting procedures" were never agreed upon.

19

negligent misrepresentation necessarily fails as a matter of law.[11]

C.

NCM's third claim is for indemnification.  The MGA Agreement Section 24, entitled "INDEMNIFICATION," contains the following language:

> MGA agrees to indemnify, defend and hold harmless Company, its officers, agents and employees, from and against any and all liability, loss, damage or expense, including extracontractual and punitive damages and attorney's fees, incurred in connection with claims or demands for damages of any nature whatsoever, to the extent it is the result of any act or omission, tortuous [sic] or otherwise, of MGA, its officers, agents or employees. . . . (MGA Agreement § 24(A).)

NCM claims that this requires MFS to indemnify it for all losses incurred by the acts and/or omissions of MFS's agents and employees.  NCM claims that this includes all damages, expenses, and attorneys' fees it has incurred relating to the bid for USF for the 2003-04 academic year and all other losses due to MFS's improper actions.  NCM estimates its losses total over $14 million dollars.  MFS, however, claims that the indemnity agreement refers only to indemnifying those claims made by third-parties and not to claims between the Plaintiff and Defendants who were the parties to the contract.

Under North Carolina law the legal effect of an indemnity clause is well-

---

[11] NCM's reliance on Rule 8 of the Federal Rules of Civil Procedure misinterprets the independent tort rule.  The problem is not that NCM plead in the alternative for both breach of contract and the tort of negligent misrepresentation, rather it is that NCM does not have sufficient facts to support a claim for negligent misrepresentation because, under the controlling law of North Carolina, the tort – unaccompanied by aggravating circumstances – is subsumed by the contract.

20

established: "Indemnity contracts are entered into to save one party harmless from some loss or obligation which it has incurred or may incur *to a third party*." Atlantic Contracting & Material Co., Inc. v. Adcock, 588 S.E.2d 36, 41 (N.C. Ct. App. 2003) (emphasis in original); see also Terry's Floor Fashions, Inc. v. Georgia-Pacific Corp., 1998 WL 1107771, at *6 (E.D.N.C. July 23, 1998) (holding that generally an indemnity clause within a contract, one party "engage[s] to make good and save another harmless from loss on some obligation which he has incurred or is about to incur to a third party") (citing New Amsterdam Cas. Co. v. Waller, 64 S.E.2d 826 (N.C. 1951). In Dixie Container Corp. v. Dale, the North Carolina Supreme Court was faced with a similar indemnity provision as is at issue here,[12] and held: "We think it is reasonably clear that in the 'indemnify and save harmless' clause, defendant only bound itself to reimburse plaintiff for any damages it became obligated to pay third persons as a result of defendant's activity on the leased premises." 160 S.E.2d 708, 711 (N.C. 1968); see also Smith v. Carolina Coach Co., 461 S.E.2d 362, 366 (N.C. Ct. App. 1995).

The provision of the MGA agreement at issue here is specifically titled "indemnity," and contains the "hold harmless" language that usually indicates an indemnification clause. See Adcock, 588 S.E.2d at 41 (holding that "indemnity"

---

[12] The indemnitee provision provided that "[indemnitor] shall indemnify and save harmless the . . . [plaintiff], and their principles against all loss, cost, including reasonable attorney's fees, or damages on account of injury to persons or property occurring in the performance of this contract and agreement." Dixie Container, 160 S.E.2d at 709.

and "hold harmless" language indicates that clause applies only to a loss or obligation that was incurred to a third party). In fact, the term indemnity itself suggests an intention to pay for third party claims. See Dixie Container, 160 S.E.2d at 711 ("Ordinarily, indemnity connotes liability for derivative fault."). Because NCM has presented no material facts for a jury to conclude that the scope of the indemnity provision contained in Section 26 of the MGA Agreement reaches more broadly than is generally afforded, NCM's indemnity claim is dismissed. See Smith, 461 S.E.2d at 367 (holding indemnity clause applied to claims of third parties and not to protect from the loss directly caused by the parties to the contract or their employees); accord 475342 Alberta, Ltd. v. Braley, 932 F.Supp. 764, 769-770 (W.D.Va. 1996) (holding that the indemnity clause does not have "unmistakably clear" language evidencing an intent to cover attorneys fees from claims other than those by third parties).

### D.

NCM's final claim is that MFS engaged in acts in violation of the Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1. Section 75-1.1 provides that "unfair or deceptive acts or practices in or affecting commerce are declared unlawful." Id. A prevailing party under this statute must show: (1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) that proximately caused actual injury to the plaintiff. Gray v. N.C. Ins. Underwriting Assoc., 529 S.E.2d 676, 681 (N.C. 2000). A trade practice is "unfair" if it is immoral, unethical,

22

oppressive, unscrupulous, or substantially injurious to customers. Id. A "deceptive" trade practice is one that "has the tendency to deceive." Id. Whether a particular act is an unfair or deceptive trade act under § 75-1.1, is for the court to determine as a matter of law. Id.

It is well established under North Carolina law that a claim under § 75-1.1 must be based on more than mere breach of contract. See Broussard, 155 F.3d at 347 (citing Branch Banking & Trust Co. v. Thompson, 418 S.E.2d 694, 700 (N.C. 1992) ("[A] mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1.").  In an effort to keep Chapter 75 claims, which provide for treble damages, from attaching to every complaint for breach of contract, North Carolina law requires a showing of "substantial aggravating circumstances" to elevate a breach of contract to the level of an unfair or deceptive trade practice.  Id.  Specifically, this Court has found that "[a]n intentional misrepresentation made for the purpose of deceiving another which has the natural tendency to injure another" can act as a sufficient aggravating circumstance.  Baldine v. Furniture Comfort Corp., 956 F.Supp. 580, 587 (M.D.N.C. 1996).  A breach of contract can also constitute an unfair or deceptive trade practice if the promisor enters into the contract with no intent to perform under that contract. Id. (citing Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, 80 F.3d 895, 903 (4th Cir. 1996) (applying North Carolina law)). However, courts "differentiate between contract and deceptive trade practice

23

claims, and relegate claims regarding the existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement to the arena of contract law." Broussard, 155 F.3d at 347 (holding that given the contractual center of that dispute, plaintiffs' § 75-1.1 claims were out of place) (citing Hageman v. Twin City Chrysler-Plymouth Inc., 681 F.Supp 303, 306-07 (M.D.N.C. 1988)).

NCM points to the following to support its § 75-1.1 claim: "[d]efendant's conduct including the destruction of documents, the binding of insurance after instructed to cease, the deliberate failure to provide critical financial information, threats to an agent stating they would send letters to insureds denying coverage, and the violation of insurance laws as they relate to the retention of files and information . . . ." (Pl.'s Mem. in Opp'n 19.) The question, here, is whether these actions, if true, are "substantial aggravating factors" to support a claim under § 75-1.1 and if so, whether sufficient evidence has been presented to raise an issue of material fact for a jury.

Several of the actions NCM allege in support of its Chapter 75 claim fail to present "substantial aggravating factors" to support such a claim. First, NCM's claim that MFS deliberately failed to provide critical financial information, and violated insurance laws as they relate to the retention of files and information do not give rise to a claim for unfair and deceptive trade practices because NCM has presented no evidence that MFS did more than violate the terms of the agreement

24

between the two parties.[13] Because no evidence has been put forth to show these activities by MFS are "substantial aggravating circumstances," NCM's claims are better addressed by contract law.  See Gilbane, 80 F.3d at 903 ("A simple breach of contract is not unfair or deceptive, however, absent substantial aggravating circumstances."); Computer Decisions, Inc. v. Rouse Office Management, Inc., 477 S.E.2d 262, 266 (N.C. Ct. App. 1996) (holding that defendant's actions did not violate Chapter 75 but instead constituted a "mere breach of contract").

Additionally, NCM's allegations that MFS continued to bind insurance after the receipt of NCM's letter instructing it to cease do not give rise to a Chapter 75 claim.  NCM has proffered no evidence suggesting that MFS's actions were "immoral, unethical, oppressive, unscrupulous, or substantially injurious." Branch Banking, 418 S.E.2d at 700.[14] First, NCM does not claim that MFS continued to bind NCM after the letter of termination was sent to the schools in August of 2003.  Rather the only evidence put forth by NCM are letters and documents showing that MFS resumed acting as NCM's agent after the March 17, 2003 suspension letter.  Although neither party has explained what happened in the

---

[13] The MGA Agreement specifies that the MFS will maintain books and records and will supply such information to NCM.  (MGA Agreement § 9.)  Section 10 of the MGA Agreement requires MFS to comply with all regulations and laws. (Id. § 10.)

[14] Additionally, NCM's reliance on a letter to Wayne State University where no business was actually bound and an undated, unsigned Experience Analysis for Bowling Green State University is simply not sufficient to raise an issue of material fact.

25

interim, the evidence presented allows only one reasonable inference: NCM allowed MFS to resume its MGA duties.[15] Thus, there is not sufficient evidence supporting a claim for unfair and deceptive trade practices on the grounds that MFS continued, unauthorized to bind NCM.

NCM also claims that MFS engaged in unfair and deceptive trade practices by threatening agents, specifically CRM, that it would send letters to insureds denying coverage if certain disputed monies were not paid by CRM. Although it is plausible that, under some circumstances, such actions might constitute an unfair and deceptive trade practice, NCM has failed to present sufficient evidence to support its claim that MFS engaged in such activities or that NCM, as opposed to CRM, would have been the party harmed. In fact, the only evidence provided by NCM is a copy of an email from Ms. White of CRM to MFS stating: "We received your 'sample' letter of May 6, 2003. I trust you have not sent it to any schools." (Pl.'s Mem. in Opp'n, Ex. 40.) NCM has not produced a copy of the letter, information about the letter's contents, or any additional information regarding the nature of the conflict between CRM and MFS. Thus, NCM has failed to provide sufficient material facts for a jury to find that MFS engaged in actions that may be

_____

[15] For example in a June 19, 2003 letter NCM sent an "Underwriting Response for Rio Grande City, ISD" to MFS setting the premium rate for the 03-04 school year for that school. (Pl.'s Mem. in Opp'n, Ex. 35.) Additionally, Exhibit 33 to Plaintiff's Memorandum in Opposition is a summary of the NCM Student Accident business. This summary includes numerous examples of NCM reviewing and responding to renewal information provided by MFS after the March 17, 2003 suspension letter was sent.

a violation of § 75-1.1.

NCM has, however, produced sufficient evidence to support its claim that MFS's alleged destruction of documents, if true, constitutes a violation of Chapter 75. If proven, the intentional destruction of relevant documents by MFS in preparation for the NCM audit could be viewed as an intentional action to mislead or deceive NCM.[16] See Gilbane, 80 F.3d at 903 ("Acts are deceptive when they possess the tendency or capacity to mislead, or create the likelihood of deception.") (citations omitted). NCM provides the deposition of Julie Siano, a former MFS employee, alleging that McKinley instructed his employees to "clean the files" in preparation for the audit and that "anything incriminating" was taken out of the files. (Siano Dep. 67.) NCM also relies on another MFS employee's deposition testimony that similarly suggests that the MFS employees altered their files in preparation for the audit by NCM. (Boyd Dep. 12, 46.) Whether this instruction was in fact given, and whether it related to destroying relevant materials or just cleaning up the files and removing duplicates is a question of fact for a jury to decide. Thus, summary judgment will not be entered as it relates to NCM's claim that MFS destroyed documents in violation of § 75-1.1.

---

[16] Although not specifically cited by NCM in its Memorandum in Opposition, the deposition testimony also suggests that documents may have been created at this time with a fabricated date and then placed in the MFS's files in anticipation of the NCM audit. (Siano Dep. 69, 86-87.) Such actions, if proven, may also give rise to a claim under 75-1.1.

27

IV.

MFS and McKinley have filed several counterclaims against NCM, specifically: 1) a request for temporary and permanent injunctive relief to restrain NCM from unlawful termination of the MGA Agreement; 2) breach of contract by NCM; 3) tortious interference with advantageous business relationships or contractual rights; and 4) cancellation of instrument.

Because the termination date identified in the Modification, July 31, 2005, has passed, Defendants' request for a temporary and permanent injunctive relief to restrain NCM from unlawful termination of the MGA Agreement is now moot. See supra, Part III (A). Additionally, based on the above analysis, supra Part III (A), Defendants' request that this Court enter a decree that the line of credit and Guaranty Agreement are now extinguished is now moot.

However, discovery in this case has been extremely contentious and Defendants have experienced great difficulty obtaining the documents requested from NCM. In fact, at the time of the October pre-trial hearing and briefing of the claims and evidence in this case, Defendants still had not received all of the documents requested in discovery.[17] Defendants have advised the Court that many of these documents are necessary to prove their counterclaims against NCM.

---

[17] Trial of this matter had been – since August 2, 2005 – set for October, 2005. The hearing was in early October and trial was to have been shortly thereafter. Because of Plaintiff's failure of document production, there was no alternative but to continue the trial.

28

Due to these difficulties, Defendants' remaining claims – for breach of contract and tortious interference with advantageous business relationships or contractual rights – will not be ruled on as a matter of law at this time.  See Peoples Fed. Sav. & Loan Ass'n, 873 F.2d at 735 (stating a party must have a full and fair opportunity to develop and present facts and legal argument in support of its position before summary judgment is entered *sua sponte*).

V.

For the foregoing reasons, summary judgment on Plaintiff's breach of contract, negligent misrepresentation, and indemnification claims will be GRANTED in favor of Defendants.  Summary judgment will not be granted as it relates to Plaintiff's claim that MFS's alleged destruction of documents constituted a violation of N.C. Gen. Stat. § 75-1.1.

Additionally, Defendants' counterclaims for temporary and permanent injunctive relief and cancellation of instrument are MOOT.  Summary judgment will not be entered on Defendants' counterclaims for breach of contract and tortious interference with advantageous business relationships or contractual rights.

This the day of December 22, 2005

     /s/ N. Carlton Tilley, Jr.<br>United States District Judge